Upon review of the competent evidence of record with respect to the errors assigned, and finding no good grounds to receive further evidence or rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, REVERSES the Opinion and Award of the Deputy Commissioner.
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties in an executed Pre-Trial Agreement, as:
 STIPULATIONS
The parties submitted a Pre-Trial Agreement at the hearing. This agreement and its attachments are incorporated herein by reference. The parties stipulate to the following:
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At all relevant times there existed between defendant and plaintiff the relationship of employer and employee.
3. Defendant is an approved self-insured.
4. Plaintiff's average weekly wage was $470.00 per week, yielding a compensation rate of $313.35.
5. The issues before the Deputy Commissioner were:
 1. Whether plaintiff sustained an occupational disease arising out of and in the course and scope of her employment with defendant?
2. And, if so, to what compensation is she entitled?
***********
The Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was a 31 year old high school graduate at the time of the hearing before the Deputy Commissioner. Defendant hired plaintiff in 1987.
2. On 7 March 1994, plaintiff worked for defendant as a textile machine operator. Plaintiff's primary duties consisted of (1) removing bobbins of spun yarn from the spinning machine, (2) cleaning the machine between cycles, and (3) guiding the yarn onto the bobbins during the spinning cycle. The bobbins that plaintiff manipulated were of various sizes, with the largest weighing roughly 20 pounds.
3. For a year and a half before 7 March 1994, plaintiff gradually felt increasing pain in her upper extremities. On 7 March 1994, plaintiff presented to Ms. D. Swicegood, R.N., the nurse at defendant's facility. Plaintiff reported discomfort and pain in her right elbow extending down into her hand, with similar less acute symptoms in her left elbow. Plaintiff related these symptoms to her job duties and denied any activities outside work that may have caused or contributed to the problem. Ms. Swicegood referred plaintiff for evaluation to Dr. Hunter G. Strader. Dr. Strader maintains a family practice and regularly visits defendant's facility to treat employees.
4. On 8 March 1994, plaintiff presented to Dr. Strader. Following examination, Dr. Strader diagnosed plaintiff with right elbow tendonitis. Tendonitis in the elbow, also known as lateral epicondylitis, is sometimes caused by repetitive, strenuous supination of the wrist against resistance or violent extension of the wrist with the hand pronated. He advised plaintiff to wear a forearm strap and gave her a prescription for anti-inflammatories. She was restricted to light duty.
5. Plaintiff's regular job duties did not involve any repetitive, strenuous supination of the wrist against resistance. Plaintiff's job duties did not involve any violent extension of the wrist with the hand pronated. Plaintiff's removing of the bobbins from the spinning machine was a repetitive task. However, there were periods of recovery time that interrupted this repetitive task. Recovery time is a period in which the muscles and tendons are relaxed and have an opportunity to receive nutrients.
6. Plaintiff was referred to Dr. H. Boyd Watts, an orthopaedic surgeon. On 17 March 1994, plaintiff presented to Dr. Watts. Following examination, she was diagnosed with bilateral epicondylitis and treated with steroidal, anti-inflammatory injections in her elbows.
7. On 12 April 1994, upon Dr. Strader's recommendation, plaintiff began a voluntary four-week leave of absence.
8. On 15 April 1994, plaintiff again presented to Dr. Watts. Dr. Watts described plaintiff's upper extremity problems as atypical, and he declined to recommend any type of surgery. He concurred with Dr. Strader's recommendation that plaintiff take a voluntary four-week leave of absence. He noted that if plaintiff showed no improvement during her leave, it was a good indicator that plaintiff's upper extremity problems were unrelated to her job duties.
9. On 3 May 1994, plaintiff again presented to Dr. Watts. Following examination, Dr. Watts opined that plaintiff's continuing problems were unrelated to her employment and argued strongly against surgery. On the same date, Dr. Strader, after conferring with Dr. Watts, referred plaintiff to another orthopaedic physician, Dr. Gary G. Poehling.
10. On 13 May 1994, plaintiff first presented to Dr. Poehling. Dr. Poehling diagnosed reflex sympathetic dystrophy (hereinafter "RSD") of her bilateral elbows. RSD is a condition manifested by diffuse burning pain, increased sensitivity to touch and other stimuli, unequal skin color and perspiration patterns, and occasionally tissue wasting. Dr. Poehling began plaintiff on a course of anti-depressant therapy.
11. Over the course of the following year, until 8 May 1995, Dr. Poehling continued plaintiff on anti-depressant medications and imposed various work restrictions in an attempt to alleviate her symptoms. Her symptoms were variable, with periods of improvement followed by periods of discomfort. On 1 September 1994, Dr. Poehling noted that plaintiff's condition was a long-term problem. On 8 May 1995, following a functional capacity evaluation, Dr. Poehling opined that plaintiff had reached maximum medical improvement. He assigned a 15% permanent partial disability rating to plaintiff's right arm and a 10% rating to her left arm. He opined that her condition was caused by repetitive overuse.
12. During plaintiff's treatment by Dr. Poehling, she experienced significant weight gain. On 4 March 1995, plaintiff presented to the nurse's station at defendant's facility. Plaintiff expressed her concerns over her weight gain and resulting back pain. Plaintiff was placed on medical leave after consultation with Dave Ulmer, defendant's safety director.
13. On 7 March 1995, plaintiff presented to Dr. Watts for evaluation of her weight gain and back pain. During this evaluation, Dr. Watts first learned of Dr. Poehling's RSD diagnosis. Dr. Watts disputed Dr. Poehling's diagnosis, particularly to the extent that Dr. Poehling suggested that plaintiff's condition was related to her employment. Dr. Watts again disputed plaintiff's RSD diagnosis in notes covering her 30 March 1995 and 1 May 1995 visits. After a review of plaintiff's case, Dr. Strader referred plaintiff to Dr. Samuel D. Moon for an evaluation and second opinion of her condition.
14. On 27 June 1995, plaintiff presented to Dr. Moon. Dr. Moon prepared a report in which he opined that plaintiff's examination produced results that could be consistent with chronic myofascial pain in the forearms, unresolved lateral epicondylitis possibly accompanied by radial tunnel syndrome, or a combination of both accompanied by sympathetically maintained pain.
At the close of his report, Dr. Moon gave his impression that plaintiff's condition was work-related. However, Dr. Moon qualified this impression by stating in deposition that he did not do one-tenth of the preparation he would normally undertake in rendering an opinion of this nature. Dr. Moon did not reach an opinion satisfactory to himself that plaintiff's employment placed her at an increased risk of developing epicondylitis or RSD. Dr. Moon noted that plaintiff may have had other incentives reinforcing her pain and disability, including legal secondary gain, employer relations issues, and psychosocial stress.
15. On 14 July 1995, Dr. Moon opined in an addendum to his 27 June 1995 report that the results of plaintiff's 27 February 1995 cold-stress test were substantially limited in confirming sympathetically maintained pain. RSD is one of a variety of sympathetically maintained pain syndromes.
16. On 3 October 1995, plaintiff again presented to Dr. Moon. Upon examination, Dr. Moon found no signs of vasomotor or sudomotor instability in plaintiff's upper extremities. She had no hyperpathia, allodynia, or other signs of unusual sensitivity in her upper extremities. Dr. Moon arranged for plaintiff to undergo a triple-phase bone scan on 10 October 1995. The bone scan revealed no definite evidence of RSD.
17. Plaintiff's employment with defendant did not place her at a greater risk of contracting upper extremity epicondylitis and/or RSD than the public generally.
18. Plaintiff returned to work for defendant on 8 February 1997, working 8 hours of a standard 12-hour shift.
***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff had the burden of proving each and every element of her occupational disease claim under G.S. 97-53(13).Moore v. J.P. Stevens Co., 47 N.C. App. 744, 269 S.E.2d 159,cert. denied, 301 N.C. 401, 274 S.E.2d 226 (1980).
2. Plaintiff failed to prove by the greater weight of the evidence that her upper extremity epicondylitis and/or reflex sympathetic dystrophy were due to causes and conditions which are characteristic of and peculiar to her employment with defendant, but excluding ordinary diseases of life to which the general public is equally exposed. Consequently, plaintiff failed to prove that she suffers from a compensable occupational disease within the meaning of the Act. N.C. Gen. Stat. § 97-53(13).
***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Plaintiff's claim must be, and hereby is, DENIED.
2. Both parties shall share the costs.
 S/_____________ RENEE C. RIGGSBEE COMMISSIONER
CONCURRING:
S/_____________ J. HOWARD BUNN, JR. CHAIRMAN
S/_____________ THOMAS J. BOLCH COMMISSIONER
RCR:mdg